Appellant, Thomas Paul Bradley, was convicted, after a jury trial, of the capital offense of murder during sexual abuse in the first degree or an attempt thereof, in violation of §13A-5-40(a)(8), Code of Alabama 1975. After a sentencing hearing, the trial court accepted the recommendation of the jury and sentenced appellant to life imprisonment without parole.
The State's evidence disclosed that, on the morning of July 14, 1986, Lieutenant Linn Moore of the Jefferson County Sheriff's Department received information that a body had been discovered underneath the bridge at the River Run Shopping Center, located on the outer area of the City of Mountain Brook, Alabama. The body, nude except for knee-length stockings, was later identified as that of 26-year-old Tracey Diane Schoettlin. Bloodstains were observed on the curb of the bridge above where Schoettlin's body was discovered. Stan Pitts of the Jefferson County Coroner's Office testified that death had occurred within a 24-hour period of the discovery of the body.
Dr. Robert Brissie, chief coroner and medical examiner for Jefferson County, testified as to the results of his July 15, 1986, autopsy of Schoettlin's body. Brissie *Page 543 
found no presence of alcohol or drugs. He identified three stab wounds to the upper lobe of the left lung, one stab wound through the heart, five stab wounds through the liver and two stab wounds into the stomach area. There was a defense-type wound to the middle finger where a tendon was cut as the victim apparently tried to protect herself. There were several antemortem head injuries including bruised lips and eyelids, a chin abrasion, fingernail marks and an indication of "running" injuries. In addition, there were three stab wounds to the neck that were found to be consistent with wounds inflicted by a dull pocketknife or a letter opener. There was antemortem bruising to the left nipple consistent with pinching, as well as antemortem impact abrasions. There was a total of 19 stab wounds, 14 of which were located between the left breast and the left abdomen. The stab wound to the heart area was found to be three and one-half inches deep and would have caused death in less than one minute. There was a bruise to the right thigh and a rip which extended upward from the rectum and vagina into the pelvic area. This latter injury consisted of a vaginal tear and massive blunt force trauma to the area, both of which were antemortem injuries. Brissie concluded that the victim had been dead at least eight hours prior to the discovery of the body and that the cause of death was due to multiple stab wounds.
A piece of "glitter" was found embedded in Schoettlin's knee. Appellant's ex-wife testified that, about two years prior to the murder, she had observed little bottles of glitter in appellant's car; and that, when asked about them, appellant explained that he used the glitter in performing witchcraft.
Forrest Scott Whitmore, an employee of Southpoint Restaurant, testified that the victim worked at the restaurant as a waitress and had "clocked out" at approximately 11:15 p.m. on July 13, 1986. The victim indicated that she was tired and was going home. She was last seen by Whitmore one block from the post office where she had parked her 1973 black Chevrolet Monte Carlo as she was walking toward the post office.
Floyd Williams, a commercial photographer, testified that he knew the victim and had spoken to her on the night of July 13, 1986, as she was walking toward her car parked at the post office. The victim indicated to Williams that she was "heading home." He heard the victim emphatically respond to someone else's invitation to her to go somewhere with "No!"
James Dudley Parker testified that he knew the victim and saw her on the night of July 13, 1986, at Tom and Jerry's Convenience Store, on the Southside of Birmingham. Parker had just gotten off work at 11:00 p.m. He saw the victim enter the store and, as he stood in the cashier line behind her, he observed her purchase two quarts of motor oil. He then saw her exit the store and walk to the left toward someone's car. As Parker left the store, he looked toward the left and saw a man in a 1969 to 1971 blue Datsun or Toyota automobile, waiting on Schoettlin. The next day, when Parker learned of the victim's murder, he contacted the sheriff's department and gave a description of the man he had seen waiting on the victim.
Johnny Hide, an employee of Tom and Jerry's Convenience Store, testified that sometime after 10:30 p.m., a blonde female came into the store and asked for his assistance in selecting two quarts of motor oil. She was in a uniform, and it appeared that she had just come from work at a restaurant. Hide identified the price markers used by the store and the cash register tape showing the purchase of the two cans of oil, at $1.79 a can, at 11:41 p.m. on July 13, 1986.
The victim's disabled black Chevrolet Monte Carlo was found on 18th Street on the Southside of Birmingham, on July 14, 1986. Andrew Green, a Jefferson County auto mechanic, testified that, upon inspection, he found that it had a bad starter; that, once it was cranked, fuel would run out of the fuel pump and the engine would stop running; and that it was two quarts overfilled with motor oil. *Page 544 
Frank Michael Hale of the Jefferson County Sheriff's Department testified that he found two empty quart oil cans with price labels like those used at Tom and Jerry's and a bag in a 55-gallon garbage can near the victim's automobile on 18th Street.
Lillie Daniels testified that she had read about the victim's murder and was walking to a store on the city's Northside when she found the victim's partially-burned driver's license.
Appellant first came to the attention of Birmingham investigators on November 4, 1986, nearly four months after the killing, when Lieutenant Moore received a call from Birmingham attorney Bob Sanford. Sanford advised Moore that appellant had received "visions from God" about the Schoettlin murder case. On November 5, 1986, Sanford, Birmingham attorney Ray Bullock, and appellant came to Moore's office, where Sanford stated to Moore that appellant had received "visions from God" regarding the murder of Schoettlin and that appellant would give information on the Schoettlin case if the authorities would tell him why he was being followed. (Moore testified that appellant was not being followed by anyone involved in the investigation of the Schoettlin case and that appellant was not even considered a suspect at that time.) The initial interview with appellant and investigating authorities, with Sanford present, took place at that time. Two days later, on November 7, 1986, appellant telephoned Sergeant Eddie White of the Jefferson County Sheriff's Department to again discuss his "visions."
No further contact was made with appellant until March 16, 1987, when he was contacted by Sergeant N.D. Harris and asked if he had had any other "visions" about the case. Sanford then had appellant set up a meeting with the investigators, which took place on March 18 and 19. Over those two days, appellant led the authorities to several different locations in the Birmingham area. During an automobile trip with White, appellant pointed out the exact location where the victim's vehicle had been found. He also directed the officers to the River Run bridge where the body had been found. At this location, he asked that the automobile be stopped. After both got out of the automobile, appellant explained to White that the victim's body had been thrown from the opposite side of the bridge from where it was actually found. However, three or four times he glanced toward the spot where the body had actually been recovered. He described how the victim had been thrown from the bridge and stated that there were bloodstains on the bridge. Appellant also revealed that, during one of his "visions," he could see that the killer burned something plastic like the victim's driver's license and threw it out on the road.
Appellant's conversations, with the officers and particularly with White, about his "visions" of the murder extended over a period of approximately 20 hours. In these conversations, appellant described, in minute detail, how the killer came upon the woman; how he convinced her to be alone with him; and how he beat her, sexually abused her, and killed her. He stated that the killer discovered her with a disabled automobile; that he stopped ostensibly to help her; that, after he cranked her car for her and she expressed concern about making it home, he took her to Tom and Jerry's to buy oil where he waited, for her, in his car; and that, upon his offer, she consented to let him take her home. He further disclosed that, one time, the victim tried to run; that, when the killer realized that the victim was performing sexual acts only to save her life, he began stabbing her; that she started fighting him; that, as he was killing her, he shouted, "You ugly beast"; that, although she appeared to be dead after the third stab, he continued to stab her eight to fourteen more times to make sure that she was dead; that he then mutilated her internally, probably with an unusual knife with a big wooden handle or with a comb; that he performed witchcraft on her; that he took, from her neck, a gold chain with something hanging on it; and that, when he realized that she was dead, he professed, "I'm sorry, I'm sorry I killed you." Appellant also knew that the killer had a knife, in a designer-type pouch hanging *Page 545 
on the right side of his hip. Appellant also claimed that his "visions" revealed to him that the victim knew "she was going to be killed"; that it "was inevitable"; and that "the victim had authorized herself to be killed because she had wilfully sinned." He further disclosed that the killer knew what he was doing during the crime; that his "motive was lust and revenge based on a girl in his past"; and that the killer knew the victim frequently read the book The Power of Positive Thinking, by Norman Vincent Peale.
In these conversations, appellant described the killer generally as someone "like me." He also specifically described the killer as having an above-average I.Q., as being well-versed in the Bible, as being strong-willed, as having a lot of hate and anger, as particularly liking blondes, and as liking to inflict pain with sex. He further revealed that the killer was very concerned about his mother not finding out about the crime; that the killer "feels that his mother would be very disappointed in him"; that the killer had been molested, by his mother, when he was a young child; and that "the killer would come forward right now and be executed on public TV in front of the whole world if the killer could keep his mother from finding out he had done something like this again." Appellant also disclosed that the killer perceives that he "is being found out" and that he has a "psychotic defense."
Appellant's defense consisted mostly of testimony from several witnesses attempting to cast doubt upon Parker's identification of appellant as being the person he observed with the victim on the night of her disappearance. Appellant also offered expert testimony of psychologist Dr. Keith Harary, in an effort to establish that appellant's "visions" were authentic. Harary characterized the "visions" as "extended perceptions" and stated that he had worked on cases where criminals, without access to criminal investigations, had described information relevant to the investigation and in precise details. Appellant did not testify.
Appellant now appeals his conviction, raising ten issues.
 I
Appellant contends that the prosecution failed to present sufficient evidence to support the jury's guilty verdict because the prosecution allegedly failed to present any direct evidence linking him to the murder of Schoettlin.
The mere fact that evidence is of a circumstantial nature does not make it deficient; circumstantial evidence is entitled to the same weight as direct evidence, provided it points to the guilt of the accused. Hinton v. State, 548 So.2d 547, 558
(Ala.Cr.App. 1988) aff'd, 548 So.2d 562 (Ala.), cert. denied, ___ U.S. ___, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989); Linzy v.State, 455 So.2d 260, 262 (Ala.Cr.App. 1984). The well established test of sufficiency of circumstantial evidence is not whether the possibility exists that someone other than the accused committed the charged crime, but rather whether the evidence excluded every reasonable hypothesis except that of the accused's guilt. White v. State, 546 So.2d 1014, 1016
(Ala.Cr.App. 1989). See also Cumbo v. State, 368 So.2d 871, 874
(Ala.Cr.App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979). "In determining the sufficiency of evidence to sustain a conviction, this court must accept as true the evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider the evidence in light most favorable to the prosecution." White v. State,546 So.2d at 1017 (quoting Faircloth v. State, 471 So.2d 485, 489
(Ala.Cr.App. 1984), aff'd, 471 So.2d 493 (Ala. 1985)).
In reviewing the evidence, we find that the prosecution's evidence presented to the jury was clearly sufficient to allow the jury to find that the evidence excluded every reasonable hypothesis except that of appellant's guilt.
Our review of the tapes and statements of appellant's "visions" discloses an account of the events leading up to the crime, of Schoettlin's brutal death, and of the gruesome mutilation and disposal of her body — an account that, in minute detail, corresponds so closely with the information *Page 546 
otherwise known by the police that it would be incredulous even to theorize that appellant was not the murderer. For example, the forensic evidence of the injuries to Schoettlin's feet, from running barefoot on asphalt, and to her hands corroborates appellant's revelation that Schoettlin fought her killer and attempted to run, and the evidence of her internal injuries corresponds with injury inflicted by the type of instrument that appellant claimed the killer used. Even the detail that the victim's necklace, which the killer took, had something hanging from it was confirmed by the victim's roommate who testified that Schoettlin always wore a gold chain with a gold cross and a baby ring hanging from it.
Not only were many of the details disclosed by appellant of the commission of the crime corroborated but significant characteristics of the killer, as revealed by appellant, were also corroborated, for they were shown to also be strikingly descriptive of appellant. For example, appellant's ex-wife testified that he, too, liked blondes and "kinky" sex; that he, too, always had a pocketknife pouch; and that he, too, had been abused by his mother as a young child. Other examples of corresponding features are that appellant was very concerned that his mother not discover that he was talking to the police about the crime and that, as the killer was motivated by "voices" to abuse and kill Schoettlin, he was motivated by "voices" to reveal his "visions" to the police.
Extremely incriminating was appellant's disclosure of knowledge of information known only to the police at the time of his statements. For example, it had not been released to the public, at the time of appellant's statements, that the victim's license had been burned; that the victim had her license in her pocket rather than in her purse; and that the victim read, every night, The Power of Positive Thinking. Yet appellant knew these details. Moreover, appellant took the police to the exact spot where the victim's car had been found and to the exact spot where her body had been recovered. These locations had not been released to the press. A description of the wounds to the body had not been disclosed; yet appellant described them in great detail, blow by blow.
Taking appellant's statements, as markedly corroborated as they were, together with Parker's identification of appellant as Schoettlin's companion and with appellant's prior behavior manifesting the psychological profile of the killer (discussed more fully in part II), we are, beyond question, convinced of appellant's guilt. Thus, we hold that appellant's motion for judgment of acquittal was properly denied.
 II
Appellant contends that the trial court erred in admitting evidence of collateral crimes or bad acts by appellant.[1]
State's witness Jodie Thompson testified that, in the early morning hours of June 25, 1986, while she was driving home on the Red Mountain Expressway from a Southside bar, appellant in his automobile attempted to force her off the road by driving his automobile into her automobile. A high speed chase down U.S. Highway 280 ensued in which Thompson's automobile was "bumped" several times and was forced to stop. Thompson then rolled down the window and exclaimed, "[J]ust what on earth do you think you are trying to do?" When the witness saw that appellant was masturbating, she immediately rolled up her window, locked her doors, and sped away. Appellant again chased Thompson at high speeds, but when Thompson brought her automobile to a screeching halt, appellant "zoomed" away. Thompson then turned her automobile around and began driving back to the City of Birmingham when appellant again drove up behind her automobile and bumped it. When she stopped at a red light, appellant *Page 547 
got out of his automobile with his pants down around the mid-thigh area, genitalia fully exposed, and began banging his fist on the window of Thompson's automobile, exclaiming something that was not intelligible to her. Thompson again sped away and "lost him." Thompson reported the incident to the police, gave a description, and later identified appellant in a photo lineup.
State's witness Kathy Ledbetter testified that, at approximately 5:30 a.m. on July 10, 1986, while she was on the Southside looking for a gasoline service station, she asked appellant, who was sitting in his automobile, if he knew where she could purchase gasoline for her automobile. Appellant told her that there was a station open a few blocks away. While Ledbetter was on her way to find the station, she noticed appellant following her in his automobile. When she arrived at the gas station, appellant pulled his automobile beside her, and she could see that he had his pants down and he was masturbating. She told him he was "a sick mother fucker" and ran into the building. Appellant drove away. Several days later, after news of the Schoettlin murder, she reported the incident to the Birmingham Police Department.
State's witness Karen McCain testified that, on July 12, 1986, the night before Schoettlin's murder, she stopped at a Southside convenience store to use a public telephone and was attacked by appellant. McCain stated that appellant walked past her while she was on the telephone, then suddenly grabbed her face and slammed it against the window. Appellant grabbed McCain's chest and ordered her not to scream, but McCain screamed and began hitting appellant with the telephone receiver. Appellant, with his pants down, fled. McCain later reported the incident to the Birmingham Police Department.
 "The general rule in Alabama is that evidence of distinct and independent offenses is not admissible in the trial of a person accused of a crime. [Citations omitted.]
". . . .
 "There are exceptions to the general rule to which we have referred. These exceptions have been discussed at length in previous decisions of this court and require no further general discussion here. . . . All of the exceptions relate to the relevancy of the evidence, which means that evidence of separate and distinct crimes are admissible only when the evidence is relevant to the crime charged. Noble v. State, 253 Ala. 519, 45 So.2d 857.
 "The exceptions may be summarized as knowledge, intent, plan or design, motive, identity and inseparable crimes. [See additional recognized exceptions as listed in Nicks v. State, 521 So.2d 1018, 1026 (Ala.Cr.App. 1987), aff'd, 521 So.2d 1035
(Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988).]"
Mason v. State, 259 Ala. 438, 440-41, 66 So.2d 557, 558-59
(1953). See also Brasher v. State, 249 Ala. 96, 30 So.2d 31
(1947); Brewer v. State, 440 So.2d 1155, 1159
(Ala.Cr.App. 1983). We have recognized that the list of traditionally recognized exceptions is not exhaustive and fixed. See Nicks v. State, 521 So.2d at 1025. "It must ever be borne in mind that the state may prove the accused's commission of another crime if such other crime is relevant for any purpose other than that of showing his guilt through the medium of bad character." C. Gamble, McElroy's Alabama Evidence § 69.0(1) (3d ed. 1977) (quoting Mr. Justice McElroy, 2nd ed.)
 "In all instances, the question is whether the proposed evidence is primarily to prove the commission of another disconnected crime, or whether it is material to some issue in the case. If it is material and logically relevant to an issue in the case, whether to prove an element of the crime, or to controvert a material contention of defendant, it is not inadmissible because in making the proof the commission of an independent disconnected crime is an inseparable feature of it."
Snead v. State, 243 Ala. 23, 24, 8 So.2d 269, 270 (1942). However, even though evidence of collateral crimes or acts may be relevant to an issue other than the defendant's character, it should be excluded if "it would serve comparatively little or no *Page 548 
purpose except to arouse the passion, prejudice, or sympathy of the jury," Spellman v. State, 473 So.2d 618, 621
(Ala.Cr.App. 1985), or put another way, "unless its probative value is 'substantially outweighed by its undue prejudice,' "United States v. Stubbins, 877 F.2d 42, 43 (11th Cir.), cert. denied, ___ U.S. ___, 110 S.Ct. 340, 107 L.Ed.2d 328 (1989) (quoting United States v. Beechum, 582 F.2d 898 (5th Cir. 1978) (en banc), cert. denied, 440 U.S. 920, 99 S.Ct. 1244,59 L.Ed.2d 472 (1979)).
We note the trial court initially ruled that the testimony of these three witnesses was admissible under the "intent" exception. However, nine days later, the trial court attempted to correct what it referred to as "a mistake on my part," and stated that the motive exception was the basis of his ruling. The intent of the murderer was not a "real and open" issue, seeAnonymous v. State, 507 So.2d 972, 975 (Ala. 1987), because criminal intent could have been inferred by the jury from the manner in which Schoettlin was killed and in which her body was disposed of. See Bowden v. State, 538 So.2d 1224, 1225
(Ala.Cr.App. 1987), aff'd, 538 So.2d 1226 (Ala. 1988); Brewer v.State, 440 So.2d at 1159; Parker v. State, 406 So.2d 1036, 1039
(Ala.Cr.App.), cert. denied, 406 So.2d 1041 (Ala. 1981). "Where the requisite intent is presumed or inferred from proof of the criminal act itself or where the intent of the defendant is not in issue, evidence of other crimes is not admissible." C. Torcia, Wharton's Criminal Evidence § 245 at 560 (13th ed. 1972)
Rather than uphold the trial court by straining to neatly fit the evidence of the three prior incidents into the narrow confines of the traditionally recognized categories, we have chosen to review the court's ruling by determining whether the evidence was "material and logically relevant" to an issue or issues in the case.
The ultimate fact in issue was the identity of the person who sexually attacked, beat, and murdered Schoettlin. The evidence that appellant perpetrated these acts against Schoettlin was completely circumstantial, and defense counsel vigorously cross-examined Parker in an effort to discredit his identification. Appellant's pervasive knowledge of the intimate details of the crime reasonably supports the inference that he was, in fact, the killer. However, to explain his possession of this knowledge and, thus, to refute the inference that he was the killer, appellant, through these same statements, asserted that such knowledge was gained from another source, other than himself, to-wit, "visions from God." Thus the jury, of necessity, had to decide whether appellant came by this information by way of the alleged "visions" or by some other source or whether he knew such information because he was the killer.
The evidence of the three incidents was clearly relevant, for it logically, naturally, and by reasonable inference tended to shed light on the ultimate issue of whether appellant was the killer. The evidence of appellant's collateral conduct tended to identify him as the killer because his bizarre and sexually deviate psychological make-up and motivation, as exhibited by this prior conduct, coincides with his description of the killer and of the killer's motivation. His behavior substantially matched the profile of the killer given by appellant. Appellant had described the killer to the police as a man who likes to inflict pain on women, who has a "rude and malicious attitude" toward women, who likes "kinky" sex, and who was motivated to kill Schoettlin because of "lust and revenge based on a girl in his past" and because Schoettlin was engaging in sexual acts, not out of sincere feelings, but only to save her life. Appellant also indicated, from additional comments, that the killer has an obsessive and distorted relationship with his mother and has a view of women that has been perverted by his religious convictions (as indicated, for example, by appellant's comment that "the victim had authorized herself to be killed because she had wilfully sinned"). The three prior acts clearly corroborated this hatred for women, intense desire to cause them pain, perverted view of the sexual aspect of women, and this proclaimed motive of lust and revenge, and, thus, tended to shed light on the identity *Page 549 
of the killer described by appellant. "Where evidence relating to other offenses has a natural tendency to corroborate or supplement admitted direct evidence, an exception is made to the general rule excluding evidence of other offenses."Nicks v. State, 521 So.2d at 1029. It is the very nature of the three prior acts that points to appellant as the person about whom he was speaking.
In conjunction with this reason for relevancy is the evidence's tendency to corroborate specifically the killer's state of mind, which appellant described as follows:
 "[H]e had this state of mind. . . . I would sure like a girl. I sure would like to have a girlfriend. I sure would, you know, like to be with a girl. That had been going on in his mind in the days prior."
We find the relevancy of the evidence to be akin to motive[2] and, thus, find the following observations appropriate here:
 "If a crime is clearly shown to have been committed by the accused, as in the case of one intentionally and without cause striking a deadly blow with an ax, the question of motive would be of little importance. But where the direct evidence is in conflict as to whether the accused did the act, or is partially or wholly circumstantial upon that issue, the question of motive becomes a leading inquiry."
Fuller v. State, 269 Ala. 312, 113 So.2d 153, 175 (1959), cert. denied, 361 U.S. 936, 80 S.Ct. 380, 4 L.Ed.2d 358 (1960) (quoting Harden v. State, 211 Ala. 656, 101 So. 442, 444
(1924)). "It is permissible in every criminal case to show that there was an influence, an inducement, operating on the accused, which may have led or tempted him to commit the offense." Bowden v. State, 538 So.2d 1226, 1235 (Ala. 1988) (quoting earlier cases, emphasis in Bowden).
We find support for this holding, by analogy, in Smith v.State, [Ms. 5 Div. 458, August 24, 1990] (Ala.Cr.App. 1990), where the court reviewed the appellant's conviction and death sentence for having abducted the victim prior to 10:00 a.m., having attempted rape, and having killed her. The appellant contended that the trial court erred in allowing testimony that, on the same morning at around 9:00 a.m., the appellant had tried to rape another woman, had forced her to perform oral sex, and had tried to shoot her. In upholding the trial court, the Smith court concluded that this testimony "was properly admitted into evidence to prove the State's theory that the appellant was on a mission in committing these two acts, and . . . the appellant was 'obsessed' and 'frustrated' by the failed attempt [to rape the first woman] and sought to take these feelings out on [the victim]." Id. at 53.
The three acts were also relevant as corroborating the statement that the killer had been driven for days prior to the murder to be with a girl. Cf. United States v. Stubbins
(wherein the court allowed testimony of the defendant's pending indictment for possession of cocaine, in prosecution for conspiracy and distribution, where his defense was mistaken identity and where the person who sold cocaine to the agent stated that he was already under indictment).
The evidence's relevancy is enhanced by the presence of glaring similarities between the now-charged offense and the three prior acts: two of the prior incidents occurred within four days of the killing and the other occurred within three weeks; all prior incidents occurred in the same geographic area where the victim was abducted; all incidents, including the abduction of the victim, occurred between the hours of 11:00 p.m. and 5:30 a.m.; all incidents involved unwarranted aggression toward lone women and two involved violent episodes of an attempt to sexually gratify; and Ledbetter and Thompson testified that appellant was in a "blue-green" automobile when he accosted them and Parker testified *Page 550 
Schoettlin's companion was in a blue automobile.[3]
In appellant's exhibition of behavior that matches appellant's profile of the killer, we find another purpose for the admission of the evidence of appellant's prior misconduct: the evidence controverts a material contention of appellant. See Snead v. State (wherein the prosecution was allowed to introduce evidence that the witness had been assaulted nine days prior to the rape for which the defendant was being prosecuted to rebut the defendant's claim that he was physically unable to commit the rape). This collateral misconduct, when considered along with appellant's intimate knowledge of the crime, refutes appellant's claim that he was not the killer, because these details, corroborated by appellant's behavior, could only have been known by the killer, and not gained from "visions of God" or any other extrinsic source.
In conclusion, we are clearly convinced that the evidence of the three prior incidents was not probative only to show appellant's bad character or propensity to commit the type of crime for which he was being prosecuted. Moreover, the probative value of the evidence clearly outweighs its prejudicial effect.
 III
Appellant's next contention involves the admissibility of statements given by appellant to the Birmingham investigating authorities.
On November 4, 1986, Sanford, acting as appellant's attorney, contacted Lieutenant Moore and informed him that appellant had received "visions from God" concerning the murder of Schoettlin. The following day appellant, accompanied by attorneys Sanford and Bullock, went to the sheriff's office to tell Moore, Sergeant Harris, and Sergeant White about his "visions." Sanford informed Moore that if appellant became a suspect to please notify him as soon as possible. Appellant then told the officers about his "visions from God." This statement was tape-recorded.
On November 7, 1986, appellant, on his own, contacted White by telephone to again discuss his "visions." This discussion was also tape-recorded.
Some four months later, on March 16, 1987, Harris called appellant and inquired if he had anything further to relate about the Schoettlin murder. A meeting was arranged for the next day with appellant and his attorneys; however, this meeting was canceled. Appellant's attorney then had appellant set up a meeting for the following day, March 18. Appellant met with members of the sheriff's department over the next two days, March 18 and 19. During these meetings, appellant directed the authorities to several different locations. All conversations on these two days between appellant and the officers were tape-recorded. At no time did the appellant confess to the murder of Schoettlin. The record reveals that no threats or promises were made to appellant, and it appears that the appellant was free to leave at any time. The record also shows that appellant's attorneys knew he was with the officers and that appellant at no time requested that his attorneys be present during these tape-recorded conversations.
After these conversations, Harris and appellant returned to the sheriff's office, Harris read appellant his rights pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694 (1966), and Harris placed him under arrest for the murder of Schoettlin.
Appellant claims that the trial court erred when it admitted his out-of-court, uncounseled statements of November 7 and of March 18 and 19 into evidence over timely objection. He first contends that they were elicited without the warnings mandated by Miranda v. Arizona. "[B]efore the [Miranda] warnings need be given, it must be established that the subject was both 'in custody' and under 'interrogation' *Page 551 
by police officers." United States v. Castro, 723 F.2d 1527,1530 (11th Cir. 1984). See Smith, The Threshold Question inApplying Miranda; What Constitutes Custodial Interrogation? 25 S.C.L. Rev. 699, 702 (1974). "[I]n order to be in custody, an individual must be subject to 'formal arrest or restraint in freedom of movement of the degree associated with a formal arrest.' " 384 U.S. at 478, 86 S.Ct. at 1630 (citations omitted).
It is clear from the record that appellant and his attorney initiated the first contact with the Jefferson County Sheriff's Department; that appellant called the sheriff's department on several occasions and asked to speak to White; and that only once did the sheriff's department extend an invitation to appellant to contact them about any other "visions" he may have had concerning the murder. Even on this latter occasion, appellant revealed nothing, told members of the sheriff's department that he would get back in touch with them, contacted his attorney, and thereafter set up an appointment with his attorney's approval.
This court, after reviewing the audio tapes of the conversations between White and appellant and the transcripts of such conversations, find that, at no time prior to the evening of March 19, 1987, was appellant in custody, nor do we find even the slightest hint of appellant's freedom having been hindered by the authorities. Therefore, we find that appellant's statements to White and others were not a product of custodial interrogation, and Miranda warnings were not required.
Appellant also alleges that, because White was a Pentecostal lay minister, he was subjected to an "intense psychological interrogation" by White's presence, especially in light of the fact that "he [appellant] was already ruled by religious teachings and doctrine."
Our review of the record reveals that, on several occasions, White and appellant engaged in prayer together. In addition, there were several episodes of encouragement by White for appellant to "get in touch" with his "visions." However, we do not find that this interaction amounted to psychological pressure, coercion, or improper influence. Our review of the record and audio tapes indicates that appellant appeared to have almost a burning desire to reveal his "visions from God" to White. Although we do find that White frequently used religious terminology in his conversations with appellant, it is obvious from the record and tapes that it was appellant's vocabulary that consisted primarily of religious terminology. We consider that White's use of those terms was nothing more than White's attempt to establish a good rapport with appellant and not to wrongly influence or to motivate a desired response.
 IV
Appellant next contends that the trial court erred in denying his motion to suppress the in-court identification by State's witness Parker because, allegedly, the identification was tainted by impermissibly suggestive pretrial procedure.
Parker testified that, on the night of the murder, he observed the victim, inside of Tom and Jerry's Convenience Store, purchasing two cans of motor oil. When Parker exited the store, he looked to the left and saw an individual sitting in an automobile and waiting for the victim. He described this person to the police as a white male, about 30 to 32 years old, with dark hair worn in a ponytail. Parker stated that, for four or five seconds, he "took a good look" at the man, thinking he was the victim's husband or boyfriend. Parker's interest stemmed from his relationship with the victim as a former co-worker at a Birmingham restaurant. Parker further testified that, two days after he last saw the victim, having heard about the murder, he reported the incident to the police and gave a description of the man he saw with the victim. Over the next several months, Parker assisted in making a composite drawing of the man he saw, reviewed hundreds of photos in mug shot books, and accompanied members of the sheriff's department on several occasions to Southside nightspots in an unsuccessful effort to spot *Page 552 
the individual he had seen on the night of the murder. Parker submitted to hypnosis, but it failed to produce any new information.
In March 1987, Parker saw a newspaper with a photograph of appellant on the front page with the headline "Suspect caught in Schoettlin murder case." Parker testified that, before he read the headline, he recognized the man in the photograph as the person he had seen with the victim on the night of her murder. Two days later, Parker identified appellant in a lineup.
We disagree with appellant's assertion that, because Parker saw appellant's photograph and name on the front page of theBirmingham News, his in-court identification should have been excluded as the result of undue suggestion. "When an in-court identification of the accused is shown to have a basis independent of any pre-trial identification, then it is properly admitted into evidence." Gray v. State, 568 So.2d 381,383 (Ala.Cr.App. 1990). See also James v. State, 549 So.2d 562,565 (Ala.Cr.App. 1989); Mullis v. State, 545 So.2d 205, 209
(Ala.Cr.App. 1989); Clements v. State, 521 So.2d 1378, 1382
(Ala.Cr.App. 1988).
 "As the Supreme Court of the United States stated in Manson v. Brathwaite, 432 U.S. 98, 114
[97 S.Ct. 2243, 2253, 53 L.Ed.2d 140] . . . (1977), 'reliability is the linchpin in determining admissibility.' The following five factors are evaluated when determining the reliability of identification testimony:
 " '(1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of his prior description of the criminal; (4) the level of certainty demonstrated at the identification; and (5) the time between the crime and the identification.'
 "Walker v. State, 523 So.2d 528, 533
(Ala.Cr.App. 1988); Phillips v. State, 462 So.2d 981, 988 (Ala.Cr.App. 1984); Flowers v. State, 402 So.2d 1088, 1092 (Ala.Cr.App.), cert. denied, 402 So.2d 1094 (Ala. 1981).
 "When considering the constitutionality of the pretrial identification, we use the two-prong test discussed in Brazell [v. State, 369 So.2d 25
(Ala.Cr.App. 1979)]. The first inquiry is 'whether the initial identification was unnecessarily or impermissibly suggestive.' [Id.] at 28. If this first inquiry is answered in the affirmative, the inquiry then proceeds to whether such a tendency gave 'rise to a very substantial likelihood of irreparable misidentification.' Id. at 28."
James v. State, 549 So.2d at 564-65.
We find here that, even if Parker's initial identification was unnecessarily or impermissibly suggestive, this suggestiveness did not give rise to a "very substantial likelihood" of irreparable misidentification. Although Parker had the opportunity to observe the man with Schoettlin for only four to five seconds, Parker, in his words, "took a good look" because his attention and curiosity were especially drawn to Schoettlin's companion. Although his prior description of the man with Schoettlin, when compared with appellant's appearance during the lineup and trial, contained discrepancies, these discrepancies, for the most part, can be explained by the passing of eight months between Parker's initial observation and the lineup. For example, Parker told the police that Schoettlin's companion had a ponytail; yet, appellant had no ponytail in the newspaper photograph or in the lineup. Although eight months elapsed between the murder and Parker's identification, we are most impressed with what occurred during those eight months, for Parker's failure to identify anyone from the hundreds and hundreds of faces (including six to seven hundred photographs) to which he was exposed during those eight months demonstrates an unshakable level of certainty in his identification. From a review and weighing of these factors,[4] we conclude that Parker's in-court identification of appellant was very reliable. *Page 553 
 V
Appellant next contends that the trial court improperly charged the jury on felony murder and, further, improperly failed to charge the jury on the lesser included offense of manslaughter. We consider these contentions separately.
 A
Appellant's requested charge No. 30 states the following:
 "The court charges you the jury that in order to find the defendant guilty of the offense charged in the indictment, that is the crime of murder, you the jury must find beyond a reasonable doubt that the defendant acted intentionally. 'Intentionally' means that a person acts intentionally with respect to a result or to conduct described by a statute defining an offense, when his purpose is to cause that result or to engage in the conduct. The court charges you the jury that if after considering all the evidence in the case, you are not convinced beyond a reasonable doubt that the defendant acted intentionally in respect to the killing of the victim, then you cannot find the defendant guilty of the offense of murder as charged in the indictment."
Appellant asserts that this charge should have been given to the jury instead of the felony murder instruction, because, he argues, it is possible that the death ensued separate and apart from any sexual abuse or attempt thereof.
This charge is misleading and erroneous, for it states that murder, rather than capital murder, is the offense charged in the indictment. Thus, it was properly denied. We further note that the court properly instructed on felony murder. The evidence is overwhelming that the murder of Schoettlin occurred during first degree sexual abuse or an attempt thereof, §13A-5-40(a)(8) and -6-2(a)(3). Moton v. State, 524 So.2d 381
(Ala.Cr.App. 1988); Rogers v. State, 417 So.2d 241, 247-48
(Ala.Cr.App. 1982).
 B
Appellant claims that he suffered from "extreme mental instability" as evidenced by his taped conversations, and that because of this condition, he was entitled to a jury charge on the lesser included offense of manslaughter. (Appellant withdrew his insanity plea prior to trial, and no evidence during the guilt phase indicated that appellant was legally insane or incapable of being legally responsible for his actions.)
We find that the trial court properly refused to instruct on manslaughter. It would be contrary to any logical reasoning to conclude that, under the facts of this case, a manslaughter charge would have been appropriate, for the evidence simply offered no factual bases for such a charge. The trial court may properly refuse to charge on a lesser included offense where the only reasonable conclusion from the evidence is that the accused is either guilty of the offense charged or of no crime at all. See Rogers v. State, 417 So.2d 241, 247-48
(Ala.Cr.App. 1982).
 C
Appellant contends that the oral charge, in its entirety, prejudiced him and denied him a fair trial. Our review of the trial court's instructions, taken as a whole, does not indicate any such prejudice. Although appellant complains that the court's explanation of certain terms resulted in a "over-simplification" and that they were "misleading," we find the trial court's instructions and explanations to be a thorough sifting of complex legal principles reduced to easily understandable and workable terms. We find no error.
 VI
Appellant's next contention is that the trial court erred in denying his motion for a new trial on the ground that a juror was unqualified, for he had been indicted for a felony within a 12-month period. Juror James Pettaway had been under indictment for burglary in the first degree, a felony, within 12 months prior to appellant's *Page 554 
trial, but all charges had been dismissed.
Appellant incorrectly alleges that an indictment for a felony or offense of the same character as that charged to appellant is ground to declare a juror unqualified under § 12-16-150(3), Code of Alabama 1975. This statute covers challenges for cause, not qualifications of jurors, which is covered under §12-16-60.
Here, appellant is asserting a challenge for cause after the verdict has been rendered. "Where a defendant challenges a petit juror after a verdict, the initial inquiry is whether the disqualification was a ground for the juror being mandatorily excused as a petit juror, and, secondly, whether the defendant exercised due diligence to keep the unqualified venireman off the jury." Lollar v. State, 422 So.2d 809, 811
(Ala.Cr.App. 1982) (citing Beasley v. State, 39 Ala. App. 182,185, 96 So.2d 693 (1957)). Here, appellant did not exercise due diligence in keeping Pettaway off the jury.
 "Since an accused may waive a statutory challenge for cause, Batson v. State, 216 Ala. 275, 113 So. 300 (1927), in order to avail himself of the alleged error, the defendant must show himself free from fault or negligence in discovering the juror's disqualification. Included in this is the issue of whether or not the silence of the juror deceived the defendant."
Lollar v. State, 422 So.2d at 811.
The question about any venireperson's being indicted within the last 12 months was asked by the trial court and is as follows:
 "Is there anyone among you or any among you that have been convicted of a felony or crime involving moral turpitude; something inherently dishonest, or have you been indicted for a like or similar offense within the last 12 months?"
This question, when reasonably construed, did not call for Pettaway to disclose his prior indictment. Thus, this is not a situation where a venireperson intentionally failed to disclose his indictment. Shortly after this question, when the prosecutor asked if any member of a venireperson's family had been arrested for a felony, Pettaway answered, "City of Birmingham settled with me out of court." In addition, when defense counsel asked Pettaway if his brother practices law in Birmingham, he responded, "Yes, he practices — he handled my case that I had." We believe that these responses were sufficient to place upon appellant's counsel the burden of further inquiry. Counsel had " 'notice of facts which ought to have elicited inquiry on his part which, if pursued with reasonable diligence, would have disclosed' the bases of challenge for cause." Id. at 812 (quoting Williams v. Dan RiverMills, Inc., 286 Ala. 703, 707, 246 So.2d 431 (1971)). By not pursuing further inquiry, appellant waived the statutory challenge for cause. Accordingly, the trial court properly denied the motion for new trial.
 VII
Appellant asserts that he was denied his right to a fair trial because the prosecutor, during closing argument, allegedly commented on his personal belief in the guilt of the accused by stating, "Devil didn't trick you, Tommy, you tricked yourself."
The trial court sustained appellant's objection to this comment, but there was no request for the trial court to exclude or instruct the jury to disregard the comment. Thus, there is no adverse ruling from which appellant may appeal.Mitchell v. State, 480 So.2d 1254, 1258 (Ala.Cr.App. 1985);Yates v. State, 390 So.2d 32, 35 (Ala.Cr.App. 1980). Furthermore, we do not find the prosecutor's remark to be so "grossly improper" or "highly prejudicial" as to have necessitated a curative instruction by the court "ex mero motu." See Mitchell v. State, 480 So.2d at 1258; Alpine v.State, 421 So.2d 1299, 1302 (Ala.Cr.App. 1981), overruled on other ground, Ex parte Chambers, 522 So.2d 313 (Ala. 1987).
 VIII
Appellant next contends that the trial court erred in allowing Sherrie Gurley to testify that her car had been stolen because, he argues, such testimony left the jury with the impression that appellant had *Page 555 
stolen the car. The record shows the following:
 "MR. ANDREWS [Prosecutor]: How were your checks lost in March?
"SHERRIE GURLEY: My car was stolen.
"Q. Describe what happened to your car.
 "MR. DAWSON [Appellant's attorney]: Judge, for the record, I object to that.
"THE COURT: Sustained, as to the details.
 "MR. ANDREWS: Can you describe your car's appearance? Was your car recovered?
"A. Yes.
 "MR. DAWSON: Judge, I would want to approach the bench.
"THE COURT: Sustained.
 "Q. Can you describe how your car looked after it was found?
"MR. DAWSON: May we approach the bench?
"THE COURT: Sure."
Then, defense counsel moved for a mistrial or for curative instructions. The trial court subsequently instructed the jury as follows:
 "You remember when Mr. Andrews yesterday was talking to Mrs. Gurley on redirect, I believe, after cross-examination. She stated that she believed her car had been taken or stolen, if you will recall that.
 "I wanted to remind you [of] the very obvious fact that Mr. Bradley is not charged with stealing Mrs. Gurley's car, you understand that. Probably should have said something to you about it then.
 "But just out of an abundance of caution, I say to you that there is no evidence suggesting that he took her car, and you should not consider that statement as in anywise bearing on the issues in the case."
These instructions cured any prejudice that might have resulted from Gurley's testimony. Thus, we find no error and hold that the trial court did not abuse its discretion in denying appellant's motion for mistrial. See Parker v. State,482 So.2d 1336, 1340 (Ala.Cr.App. 1985); Williams v. State,451 So.2d 411 (Ala.Cr.App. 1984). Also see Shadle v. State, 280 Ala. 379, 194 So.2d 538 (1967); Retowsky v. State, 333 So.2d 193
(Ala.Cr.App. 1976).
 IX
Appellant next contends that the trial court erred in overruling his objection to the following prosecutor's closing remarks, which, he argues, are improper references to the prosecutor's personal belief in appellant's guilt:
 "MS. PULLIAM [PROSECUTOR]: . . . Tommy Bradley cannot confess. He has already told without telling. In his words, he is frozen, he is stuck. You recall on the tapes, 'He's like a car in forward, but not forward; and backward reverse, but not reverse. He is somewhere in between. He is idling somewhere in between. He is frozen. He is stuck.' He has confessed without confessing.
 "What he is, is he is exposed. He has been exposed in the courtroom over the last nine days in front of you. I know you feel it in your hearts. I know that you know who killed Tracey Schoettlin. —
 "MR. DAWSON: Judge, for the record, we object to that form of argument, putting yourself in the place. That is improper.
"THE COURT: In the place of the deceased?
 "MR. DAWSON: What you feel what you've done and all of that. There [is] something else we want to put on the record.
 "THE COURT: All right. Proceed along, please, ma'am."
First and foremost, the record does not reveal an adverse ruling by the trial court which is a preliminary requirement to preservation of error for appeal. Walker v. State,416 So.2d 1083, 1097 (Ala.Cr.App. 1982); Van Antwerp v. State,358 So.2d 782 (Ala.Cr.App.), cert. denied, 358 So.2d 791 (Ala. 1978). Thus, this issue is not properly before this court for review.
Furthermore, appellant's claim lacks merit.
 "[T]he rule on which the weight of authority is in agreement is that it is improper for the prosecuting attorney so to *Page 556 
express his personal opinion or belief in guilt of accused as to permit an inference by the jury that such opinion or belief is based on reasons or information outside the evidence, but that it is not improper for him to argue or to express his opinion that accused is guilty, where he states, or it is apparent, that such opinion is based solely on the evidence."
23A C.J.S. Criminal Law § 1104, p. 194-95 (1961). See Gallowayv. State, 484 So.2d 1199, 1201 (Ala.Cr.App. 1986), and cases cited therein (wherein the court noted that where the comments "constituted mere expression of opinion and deductions and conclusions, based upon the evidence and . . . did not appeal to prejudice, [it] was not prejudicial and is not reversible").
 X
Appellant next contends that the cumulative effect of the prosecution's allegedly improper conduct so prejudiced appellant as to constitute reversible error. We have reviewed the record and find no merit to this contention.
After a careful review of the record and the issues raised by appellant, the judgment of the circuit court is due to be, and it is hereby, affirmed.
AFFIRMED.
All Judges concur.
[1] We note that, in brief, appellant contested the admission of only two incidents, "expos[ing] himself to a girl in an automobile", evidently referring to the encounter with Kathy Ledbetter, and "expos[ing] himself to another girl [Karen McCain] at a phone booth." We have chosen to address the three significant collateral incidents upon which the prosecution relied since the propriety of their admission rests upon the same principles.
[2] Motive has been defined as "that state of mind which works to 'supply the reason that nudges the will and prods the mind to indulge the criminal intent.' " C. Gamble, Character Evidence:A Comprehensive Approach, at 42 (1987) (quoted in Bowden v.State, 538 So.2d 1226, 1235 (Ala. 1988)).
[3] The record is not clear as to whether the three witnesses, Thompson, Ledbetter and McCain were in fact "blonds." The record does show several references to the witnesses having blond hair, and without objection. However, the individual testimony of each witness fails to reveal that they each had blond-colored hair. The victim, however, was a blond.
[4] We further note that Parker's version of the circumstances surrounding his identification was corroborated to a considerable extent by appellant's "visions."