The appellant, Marcus Presley, was convicted of the capital offense of murder committed during a robbery in the first degree. See §13A-5-40(a) (2), Ala. Code 1975. The jury, by a vote of 12-0, recommended that Presley be sentenced to death. The trial court accepted the jury's recommendation and sentenced Presley to death by electrocution.
The State's evidence tended to show the following. At approximately 9:00 p.m. on May 18, 1996, Presley entered the Citgo gasoline service station and convenience store on Jefferson Avenue in Birmingham. Marvin Smith, the clerk at the convenience store, was working behind the counter, operating the cash register, when Presley entered. Smith was the only store employee working that night, and there was one customer in the store. A surveillance camera inside the store captured the ensuing events on videotape.[1] The videotape showed Presley enter the store, get a soft drink out of a cooler, and place the drink on the counter. Presley then walked to the front door of the store and looked outside, before opening the door, stepping outside, and looking around. Presley then came back inside the store and waited in line behind the other customer, who was making a purchase at the counter. When the customer left the store, Presley stepped up to the counter and pointed to a merchandise display behind the counter. In response, Smith turned to get the item (a package of Tylenol pain medicine), which he then placed on the counter for Presley. Presley gave Smith a five-dollar bill, and Smith rang up the purchase on the cash register. As Smith was giving Presley his change, Presley pointed at Smith and then pulled out a pistol. Smith began to run, and Presley leaned over the counter and shot Smith once in the back. Presley then left the store. Smith was able to make it outside of the store before collapsing. He was taken to the hospital, where, shortly after arriving, he died from the gunshot wound. Testimony revealed that no money was missing from the store after the incident.
The State presented evidence that on August 28, 1996, Presley gave a statement to police in which he admitted that he had entered the Citgo convenience store with a .44 caliber pistol and had told Smith to give him the money from the cash register. Presley stated that when Smith then ran, he shot Smith in the back. In this interview, Presley told the police that he did not know Smith. He also told the police that an individual he knew only as "Chris" had been with him on the night of the incident and had waited outside while he went inside to commit the robbery.
Testimony indicated that nearly a year and a half later, in November 1997, police *Page 106 
showed Presley a photographic lineup for the purpose of having him identify "Chris." While being shown the lineup, Presley told the police, contrary to his statement in August 1996, that he had not intended to rob Smith, but instead had entered the store intending to shoot Smith because, he said, he and Smith "had gotten into it" on another occasion. (R. 382.)
The State presented evidence that from April 1996 to June 1996, Presley had committed several other robberies and that those robberies were similar to the Citgo robbery in which Smith was killed. The State offered the testimony of six robbery victims, all of whom testified that Presley had robbed them at gunpoint at the stores where they worked.
State's witness James Pinkston, the owner of J S Produce Company in Birmingham, testified that on June 21, 1996, at approximately 3:00 p.m, Presley and an accomplice, Lasamuel Gamble, came into his store. According to Pinkston, Presley picked up a soft drink and a watermelon and set them on the counter. Presley then pulled out a gun, pointed it at Pinkston's face, and said, "This is a hold-up." Pinkston testified that when he put his hands up, Presley saw that he had a gun and told Gamble to take the gun from Pinkston. Presley then ordered Pinkston to open the cash register and to give him the money inside. After getting the money, Presley told Pinkston to lie facedown on the floor. Presley then fired a shot at Pinkston's leg, but the bullet missed Pinkston. After Presley and Gamble left the store, Pinkston discovered that they had left a gun on the counter, and that the gun was not Pinkston's. Ballistics tests performed on this gun, a .44 caliber pistol, revealed that it was the same gun that had been used one month earlier during the Citgo robbery to kill Smith. (In his August 1996 statement to police, Presley admitted that he and Gamble had robbed Pinkston's store and that Gamble had left his gun on the counter at the store.)
State's witness Jerry Cushing, the manager of Grant's Food Mart in Birmingham, testified that at approximately 11:00 a.m. on April 19, 1996, he was working alone at the store when Presley came into the store, asked him a question about food stamps, and then left. Cushing testified that 10 to 15 minutes later, after the store had cleared of customers, Presley returned, walked around the store, and came to the counter. Presley then pointed a gun at Cushing, and told Cushing to give him all the money in the cash register. Cushing gave Presley the money, then a customer came inside the store and Presley left.
State's witness Wayne Perry testified that on June 19, 1996, at approximately 10:00 p.m., he was working alone at Crazy Bill's Fireworks in Birmingham, when two young black males came into the store. Perry testified that one of the men, whom he identified as Presley, stood beside the front door, while the other man went to the back of the store. According to Perry, Presley pulled a gun on him and made him lie facedown on the floor. When Presley was unable to open the cash register, he made Perry get up and open the register. Presley then made Perry lie back down on the floor and pointed the gun at the back of Perry's head. Perry testified that, before leaving, the two men argued about whether to shoot Perry. After taking the money from the cash register, Perry's wallet, and some fireworks, Presley and the other man left the store.
State's witness Jean Duke testified that on June 26, 1996, she was the only employee working at the ABC (Alabama Beverage Control) Board store in Clanton, when, at around 2:30 p.m., two young black males, one of whom she identified as Presley, entered the store and asked her if they could use the restroom. When Duke told the two men that the restroom was not for the public, Presley pulled out a gun, pointed it at her head, and told her *Page 107 
that he wanted the money from the store's safe and cash register. Duke then gave Presley the money in the cash register and, with Presley holding his gun to her back, led the two men to the back of the store to the safe. After Duke gave the men the money in the safe, Presley pushed Duke into the restroom and closed the door. Duke testified that she could hear Presley outside the door fumbling with his gun. Presley then opened the door and made Duke lie facedown on the floor. Presley and his accomplice, whom Duke identified as Lasamuel Gamble, then left the store.
State's witness Cindy Thomas testified that on June 29, 1996, she was working alone at the City Limit Package Store in Clanton, when, at approximately 2:45 p.m., Presley came inside the store and asked her if the store sold soft drinks. Thomas testified that she had seen Presley in the store the previous week. Presley brought a drink and some chips to the counter, set them down, and then quickly pulled out a gun and pointed it at Thomas's head. Thomas gave Presley all of the money in the cash register and some money in a bank bag in a filing cabinet. Presley then ordered Thomas to lie facedown on the floor. Thomas testified that when she had trouble getting down on the floor behind the counter, Presley said to her, "Are you stupid?" (R. 431.) Presley then shot Thomas in the back and left the store.
State's witness Geraldine Motley testified that on June 30, 1996, at approximately 2:30 p.m., she was working alone at Curt's Package Store in Birmingham, when two young men, whom she identified as Presley and Gamble, came into the store and bought some juice. Motley stated that the men then left, but hung around outside the store for a short time. Motley testified that the two men came back inside the store, and Presley pulled out a gun and ordered her to open the cash register; he threatened to kill her if she did not. After Motley gave Presley the money from the register, Presley told her that he wanted the money from the store's safe. Motley first told Presley that she did not have the keys to the safe. As Presley held the gun to her head and threatened to kill her, Motley got the keys, opened the safe, and gave Presley the money inside it. When she opened the safe, an old gun was visible inside, and Presley, angry upon seeing the gun, told Motley that she had planned to kill him. Presley then ordered Motley to lie facedown on the floor. Motley testified that she was hysterical and could not keep still. Presley then shot Motley in the leg. The bullet entered Motley's thigh, exited, and then entered and lodged in her other thigh.
Presley did not testify at trial.
 I.
On appeal, Presley contends that the trial court erred by allowing into evidence testimony relating to collateral crimes. Specifically, Presley argues that the testimony of State's witnesses Cushing, Perry, Duke, Thomas, and Motley concerning the other robberies Presley allegedly committed before and after the Citgo robbery should not have been admitted because, he says, their testimony was not probative of any issue in the case, and it was offered solely to show his bad character or his propensity to commit criminal acts. He argues that through the testimony of these witnesses, the State improperly sought to inflame the passions and prejudices of the jury and that he was thereby denied his right to a fair trial.
The record reflects that the State filed a pretrial notice of its intent to introduce testimony concerning the other robberies allegedly committed by Presley. The trial *Page 108 
court reserved ruling on the admissibility of such evidence until trial, when the State called its first witness to testify concerning the collateral crimes. Presley's objection to the testimony made at that time was overruled, and the trial court admitted the evidence of the collateral crimes, finding that it was relevant to show intent, motive, common plan or scheme, and identity. The trial court instructed the jury that it could consider the evidence of the collateral crimes only for the purpose of determining Presley's intent and motive and whether they were part of a common plan or scheme. (Although the trial court had also found that the collateral-crimes evidence was admissible to show identity, it did not instruct the jury that it could consider the evidence for that purpose.)
 "On the trial for the alleged commission of a particular crime, evidence of the accused's having committed another act or crime is not admissible if the only probative function of such evidence is to prove bad character and the accused's conformity therewith. This is a general exclusionary rule which prevents the introduction of prior acts or crimes for the sole purpose of suggesting that the accused is more likely to be guilty of the crime in question. . . .
". . . .
 "The foregoing exclusionary rule does not work to exclude evidence of all crimes or acts, only such as are offered to show the defendant's bad character and conformity therewith on the occasion of the now-charged crime. If the defendant's commission of another crime or misdeed is relevant for some other material purpose in the case then it may be admitted."
C. Gamble, McElroy's Alabama Evidence, § 69.01(1) at 300-01 (5th ed. 1996) (footnotes omitted). "This rule is generally applicable whether the other crime or act was committed before or after the one for which the defendant is presently being tried." Id. at 300.
"[E]vidence of collateral offenses may be admissible under certain exceptions to the exclusionary rule or for `other purposes' than to prove the accused's guilt." Williamson v. State, 629 So.2d 777, 780
(Ala.Cr.App. 1993). In Nicks v. State, 521 So.2d 1018 (Ala.Cr.App. 1987), aff'd, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241,108 S.Ct. 2916, 101 L.Ed.2d 948 (1988), this court discussed the exceptions to the general exclusionary rule:
 "Numerous Alabama cases list the exceptions to the general exclusionary rule, or tests for relevancy, whereby evidence of collateral crimes or acts may be admitted. These exceptions include the following:
 "`(1) Relevancy to prove physical capacity, skill, or means to commit the now-charged crime; (2) part of the res gestae or part of a continuous transaction; (3) relevancy to prove scienter or guilty knowledge; (4) relevancy to prove criminal intent; (5) relevancy to prove plan, design, scheme, or system; (6) relevancy to prove motive; (7) relevancy to prove identity; (8) relevancy to rebut special defenses; and (9) relevancy in various particular crimes.'
 "Nelson v. State, 511 So.2d 225, 233 (Ala.Cr.App. 1986). See also Twilley v. State, 472 So.2d 1130
(Ala.Cr.App. 1985); Brewer v. State, [440 So.2d 1155
(Ala.Cr.App.), cert. denied, 440 So.2d 1155 (1983)]; Miller v. State, 405 So.2d 41 (Ala.Cr.App. 1981); Thompson v. State, 374 So.2d 377 (Ala.Cr.App. 1978), aff'd, 374 So.2d 388 (Ala. 1979); McMurtrey v. State, 37 Ala. App. 656, 74 So.2d 528 (1954); Wilkins v. State, 29 Ala. App. 349, 197 So. 75, cert. denied, 240 Ala. 52, 197 So. 81 (1940); McElroy's §§ 69.01(1)-(11); Schroeder, Evidentiary Use in Criminal Cases of Collateral Crimes and Acts: A Comparison of the Federal Rules and Alabama Law, 35 *Page 109 
Ala.L.Rev. 241 (1984). All of the exceptions relate to the relevancy of the evidence, which means that evidence of separate and distinct crimes is admissible only when the evidence is relevant to the crime charged. Mason v. State, 259 Ala. 438, 66 So.2d 557
(1953); Noble v. State, 253 Ala. 519, 45 So.2d 857
(1950).
 "`All evidence is relevant which throws, or tends to throw, any light upon the guilt or the innocence of the prisoner. And relevant evidence which is introduced to prove any material fact ought not to be rejected merely because it proves, or tends to prove, that at some other time or at the same time the accused has been guilty of some other separate, independent and dissimilar crime. The general rule is well settled that all evidence must be relevant. If evidence is relevant upon the general issue of guilt, or innocence, no valid reason exists for its rejection merely because it may prove, or may tend to prove, that the accused committed some other crime, or may establish some collateral and unrelated fact. Evidence of other acts to be available must have some logical connection and reveal evidence of knowledge, design, plan, scheme, or conspiracy of the crime charged; or circumstantial evidence of identity of the person charged with the crime; or tends to corroborate direct evidence admitted.'
"Underhill, Criminal Evidence § 154 (3d ed. 1923)."
521 So.2d at 1025-26. "`The decision whether to allow or not to allow evidence of collateral crimes or acts as part of the State's case-in-chief rests within the sound discretion of the trial judge.'"Akin v. State, 698 So.2d 228, 234 (Ala.Cr.App. 1996), cert. denied,698 So.2d 238 (Ala. 1997), quoting Blanco v. State, 515 So.2d 115, 120
(Ala.Cr.App. 1987).
In Bradley v. State, 577 So.2d 541 (Ala.Cr.App. 1990), this court stated:
 "We have recognized that the list of traditionally recognized exceptions is not exhaustive and fixed. See Nicks v. State, 521 So.2d [1018] at 1025 [(Ala.Cr.App 1987), aff'd, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948
(1988)]. `It must ever be borne in mind that the state may prove the accused's commission of another crime if such other crime is relevant for any purpose other than that of showing his guilt through the medium of bad character.' C. Gamble, McElroy's Alabama Evidence
§ 69.0(1) (3d ed. 1977) (quoting Mr. Justice McElroy, 2nd ed.)
 "`In all instances, the question is whether the proposed evidence is primarily to prove the commission of another disconnected crime, or whether it is material to some issue in the case. If it is material and logically relevant to an issue in the case, whether to prove an element of the crime, or to controvert a material contention of defendant, it is not inadmissible because in making the proof the commission of an independent disconnected crime is an inseparable feature of it.'
 "Snead v. State, 243 Ala. 23, 24, 8 So.2d 269, 270
(1942). However, even though evidence of collateral crimes or acts may be relevant to an issue other than the defendant's character, it should be excluded if `it would serve comparatively little or no purpose except to arouse the passion, prejudice, or sympathy of the jury,' Spellman v. State, 473 So.2d 618, 621
(Ala.Cr.App. 1985), or put another way, `unless its probative value is "substantially outweighed by its undue prejudice,"' United States v. Stubbins, 877 F.2d 42, 43 (11th Cir.), cert. denied, 493 U.S. 940, 110 S.Ct. 340, 107 L.Ed.2d 328 (1989) (quoting United States v. Beechum, 582 F.2d 898 (5th Cir. 1978) (en banc), cert. denied, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472(1979)).
". . . . *Page 110 
 "Rather than uphold the trial court by straining to neatly fit the evidence of the three prior incidents into the narrow confines of the traditionally recognized categories, we have chosen to review the court's ruling by determining whether the evidence was `material and logically relevant' to an issue or issues in the case."
577 So.2d at 547-48. "If evidence of the accused's commission of another crime is admissible, the state may prove in meticulous detail the manner in which the accused committed such other crime." Bush v. State,695 So.2d 70, 85 (Ala.Cr.App. 1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997).
We find that, in this case, the evidence of the collateral crimes was material and logically relevant to show Presley's intent and motive in committing the charged crime. See Knight v. State, 675 So.2d 487, 499
(Ala.Cr.App. 1995). "`If an accused is charged with a crime that requires a prerequisite intent, . . . then prior or subsequent criminal acts are admissible to establish that he had the necessary intent when he committed the instant crime.'" Hinton v. State, 632 So.2d 1345, 1348
(Ala.Cr.App. 1993), quoting Jones v. State, 439 So.2d 1308, 1310
(Ala.Cr.App. 1983) (emphasis in Hinton omitted). In addition, "evidence tending to establish motive is always admissible." Jordan v. State,629 So.2d 738, 741 (Ala.Cr.App. 1993), cert. denied, 511 U.S. 112,114 S.Ct. 2112, 128 L.Ed.2d 671 (1994). As this court stated in Bradley, supra:
 "`If a crime is clearly shown to have been committed by the accused, as in the case of one intentionally and without cause striking a deadly blow with an ax, the question of motive would be of little importance. But where the direct evidence is in conflict as to whether the accused did the act, or is partially or wholly circumstantial upon that issue, the question of motive becomes a leading inquiry.'
 "Fuller v. State, 269 Ala. 312, 113 So.2d 153, 175
(1959), cert. denied, 361 U.S. 936, 80 S.Ct. 380, 4 L.Ed.2d 358 (1960) (quoting Harden v. State, 211 Ala. 656, 101 So. 442, 444 (1924)). `It is permissible in every criminal case to show that there was an influence, an inducement, operating on the accused, which may have led or tempted him to commit the offense.' Bowden v. State, 538 So.2d 1226, 1235 (Ala. 1988) (quoting earlier cases, emphasis in Bowden)."
577 So.2d at 549.
In his statement to police in November 1997, Presley disavowed his earlier statement in which he admitted that he intentionally shot Smith while attempting to rob the Citgo convenience store, and claimed instead that he had "gotten into it" with Smith before the shooting, and that these bad feelings, and not robbery, was his motive for shooting Smith. Presley's theory of defense at trial was consistent with his November 1997 statement to police. Presley's counsel argued that because Presley did not intend to rob Smith, he was at most guilty of intentional murder, not capital murder, for the shooting of Smith. In support of the defense theory that no robbery or attempted robbery occurred, Presley's counsel repeatedly argued to the jury that nothing was stolen from the Citgo store, and that Presley's actions on the surveillance videotape were consistent with Presley's claim (in the November 1997 statement) that he shot Smith because he and Smith had had prior difficulties.
To prove the capital-murder charge, the State was required to show that Presley intentionally murdered Smith during a robbery or an attempted robbery. Presley's claim that he shot Smith because the two had previously "gotten into it" bore directly on the issue whether there was, in fact, a robbery. Because Presley's motive and intent when he entered the Citgo store and shot Smith were called into question, his prior and subsequent *Page 111 
actions in the robberies of the other stores were relevant to prove his intent and motive when he fired the bullet that killed Smith. SeeKnight, supra, 675 So.2d at 500. Further, the similarities between the other robberies and the crime that resulted in Smith's death were sufficient to establish that all of the robberies were part of a common scheme or plan. Id. The testimony concerning the collateral crimes was admissible because it was probative of matters in issue other than Presley's bad character or his propensity to commit criminal acts.
Furthermore, we find that the probative value of the collateral-crimes evidence clearly outweighed its prejudicial effect, particularly in view of Presley's theory of defense at trial. Finally, the trial court's limiting instructions to the jury were sufficient to apprise the jury of its responsibilities in considering the collateral-crimes evidence. Accordingly, the trial court did not abuse its discretion in admitting the evidence of the prior and subsequent robberies committed by Presley.
 II.
Presley also contends that the trial court erroneously denied his motion for a judgment of acquittal made at the close of the State's case because, he says, "[e]ven with the testimony of the (5) five witnesses concerning collateral crimes, no testimony was adduced that established any intent on the part of Marcus Presley to commit murder during the course of a robbery as none of the alleged victims were murdered." (Presley's brief to this court, pp. 9-10.) Presley argues that there was no evidence of a robbery in this case because, he says, (1) the surveillance videotape contained no indication of any words, threats, or acts by Presley against Smith to show that a robbery occurred; (2) the testimony showed that nothing was taken from Smith or from the Citgo store during the incident; and (3) Presley told police in his November 1997 statement that he did not intend to rob Smith, but instead went there to shoot Smith because the two men had previously "gotten into it."
"In a challenge of the sufficiency of the evidence, an appellate court must consider the evidence in the light most favorable to the prosecution, and the appellate court will not substitute its judgment for that of the trier of fact." Maddox v. State, 620 So.2d 132, 133
(Ala.Cr.App. 1993). Conflicting evidence presents a jury question not subject to review on appeal, provided that the state's evidence established a prima facie case. Gunn v. State, 387 So.2d 280
(Ala.Cr.App.), cert. denied, 387 So.2d 283 (Ala. 1980). A trial court's denial of a motion for a judgment of acquittal must be reviewed by determining whether there existed legal evidence before the jury, at the time the motion was made, from which the jury by fair inference could have found the defendant guilty beyond a reasonable doubt. Willis v.State, 447 So.2d 199 (Ala.Cr.App. 1983). Furthermore:
 "`"A verdict of conviction will not be set aside on the ground of insufficiency of the evidence, unless, allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince this Court that it was wrong and unjust."'"
McCollum v. State, 678 So.2d 1210, 1215 (Ala.Cr.App. 1995), quoting Coxv. State, 500 So.2d 1296 (Ala.Cr.App. 1986), quoting in turn other cases.
The State clearly made out a prima facie case of the capital offense of murder committed during a robbery or an attempted robbery. Although in his November 1997 statement to police Presley denied that he intended to rob Smith, he initially told police, in August 1996, that he did in fact intend to rob Smith and that he intentionally shot Smith when Smith attempted to run without giving him any money. Further, Presley's actions on the surveillance videotape were consistent with an attempt to commit a robbery. The fact *Page 112 
that Presley did not actually take anything from Smith or from the store does not establish that he did not have the requisite intent to commit a robbery. The current robbery statutes do not require an actual "taking" of property, see Gainey v. State, 647 So.2d 37 (Ala.Cr.App. 1994), and an attempted robbery is sufficient to support the capital offense of murder during a robbery, see § 13A-5-40(a) (2), Ala. Code 1975. Based in part on the testimony of State's witnesses concerning the other robberies Presley committed before and after the crime that resulted in Smith's death, the jury could reasonably have concluded that Presley intended to rob Smith as well.
Whether Presley had the intent to rob Smith was a question for the jury to resolve. Viewing the evidence in a light most favorable to the prosecution, we find that there was sufficient evidence to allow the jury to find beyond a reasonable doubt that Presley intentionally killed Smith during a robbery or an attempted robbery. Thus, the trial court properly denied Presley's motion for a judgment of acquittal.
 III.
In accordance with Rule 45A, Ala.R.App.P., we have examined the record for any plain error with respect to Presley's capital murder conviction and death sentence, whether or not brought to our attention or to the attention of the trial court. We find no plain error or defect in the proceedings, either in the guilt phase or in the sentencing phase of the trial.
We have also reviewed Presley's sentence in accordance with §13A-5-53, Ala. Code 1975, which requires that, in addition to reviewing the case for any error involving Presley's capital murder conviction, we shall also review the propriety of the death sentence. This review shall include our determination of the following: (1) whether any error adversely affecting the rights of the defendant occurred in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence; and (3) whether death is the appropriate sentence in the case. Section13A-5-53(b) requires that, in determining whether death is the proper sentence, we determine: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by this court of the aggravating and mitigating circumstances indicates that death is the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
After the jury convicted Presley of the capital offense charged in the indictment, a separate sentencing hearing was held before the jury in accordance with §§ 13A-5-45 and -46, Ala. Code 1975. After hearing evidence concerning aggravating and mitigating circumstances; after being properly instructed by the trial court as to the applicable law; and after being correctly advised as to its function in reference to the finding of any aggravating and mitigating circumstances, the weighing of those circumstances, if appropriate, and its responsibility in reference to the return of an advisory verdict, the jury recommended, by a vote of 12-0, that Presley be sentenced to death.
Thereafter, the trial court held another hearing, in accordance with § 13A-5-47, Ala. Code 1975, to aid it in determining whether it would sentence Presley to death as recommended by the jury or to life imprisonment without the possibility of parole. The trial court ordered and received a written presentence investigation report, as required by § 13A-5-47(b). Upon conclusion of the hearing, the trial court entered specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, Ala. Code 1975, each mitigating circumstance enumerated in § 13A-5-51, Ala. Code 1975, and any mitigating circumstance found to exist under § 13A-5-52, Ala. Code 1975, as well as *Page 113 
written findings of fact summarizing the offense and Presley's participation in the offense.
In its findings of fact, the trial court found the existence of three statutory aggravating circumstances: (1) that Presley committed the capital offense while under a sentence of imprisonment, which includes being on probation or parole, see § 13A-5-49(1), Ala. Code 1975;[2]
(2) that Presley was previously convicted of another capital offense, see § 13A-5-40(2), Ala. Code 1975;[3] and (3) that the murder was committed while Presley was engaged in the commission of a robbery, see § 13A-5-49(4), Ala. Code 1975.
The trial court found the existence of one statutory mitigating circumstance: that Presley was 16 years old at the time of the offense, see § 13A-5-51(7), Ala. Code 1975. The trial court also afforded counsel for Presley the opportunity to present testimony and argument regarding Presley's character or record and any of the circumstances of the offense that Presley offered as a basis for sentencing him to life imprisonment without parole instead of death, see § 13A-5-52, Ala. Code 1975. Presley did not present any testimony at the sentencing phase of the trial, and after hearing the argument of counsel, the trial court found that no nonstatutory mitigating circumstances existed.
The trial court's sentencing order reflects that after considering all the evidence presented, the arguments of counsel, the presentence report, and the advisory verdict of the jury and after weighing the aggravating circumstances against the statutory mitigating circumstance in the case, the trial court found that the aggravating circumstances outweighed the mitigating circumstances. Accordingly, the trial court sentenced Presley to death. The trial court's findings concerning the aggravating circumstances and the mitigating circumstances are supported by the evidence.
Presley was convicted of the offense of murder committed during the course of a robbery. This offense is defined by statute as a capital offense. See § 13A-5-40(2), Ala. Code 1975. We take judicial notice that similar crimes have been punished capitally throughout the state. See, e.g., Melson v. State, [Ms. CR-95-1681, March 26, 1999] ___ So.2d ___ (Ala.Cr.App. 1999); Burgess v. State, [Ms. CR-94-0475, December 18, 1998] ___ So.2d ___ (Ala.Cr.App. 1998); Clemons v. State, 720 So.2d 961
(Ala.Cr.App. 1996), aff'd, 720 So.2d 985 (Ala. 1998), cert. denied,525 U.S. 1124, 119 S.Ct. 907, 142 L.Ed.2d 906 (1999); Williams v. State,710 So.2d 1276 (Ala.Cr.App. 1996), aff'd, 710 So.2d 1350 (Ala.), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998); Kuenzel v.State, 577 So.2d 474 (Ala.Cr.App. 1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991);Brownlee v. State, 545 So.2d 151 (Ala.Cr.App. 1988), aff'd, 545 So.2d 166
(Ala.), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161
(1989); Hallford v. State, 548 So.2d 526 (Ala.Cr.App. 1988), aff'd,548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354,107 L.Ed.2d 342 (1989); Davis v. State, 536 So.2d 110 (Ala.Cr.App. 1987), aff'd, 536 So.2d 118 (Ala. 1988), cert. denied, 490 U.S. 1028,109 S.Ct. 1766, 104 L.Ed.2d 201 (1989); Cochran v. State, 500 So.2d 1161
(Ala.Cr.App. 1984), aff'd in part, *Page 114 
rev'd in part, 500 So.2d 1179 (Ala. 1985), aff'd on return to remand, 500 So.2d 1188 (Ala.Cr.App.), aff'd, 500 So.2d 1064 (Ala. 1986), cert. denied, 481 U.S. 1033, 107 S.Ct. 1965, 95 L.Ed.2d 537 (1987).
After carefully reviewing the record of the guilt phase and the sentencing phase of Presley's trial, we find no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. We conclude that the findings and conclusions of the trial court are amply supported by the evidence. We have independently weighed the aggravating circumstances against the statutory mitigating circumstance, and we concur in the trial court's judgment that the aggravating circumstances outweigh the mitigating circumstance, and that death is the appropriate sentence in this case. Considering the crime committed by Presley, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.
Presley's conviction and sentence of death are affirmed.
AFFIRMED.
McMillan, Cobb, Baschab, and Fry, JJ., concur.
[1] There was no audio portion on the videotape.
[2] In March 1996, Presley was convicted of receiving stolen property in the first degree. He was sentenced to 10 years' imprisonment, but his sentence was suspended and he was placed on 2 years of probation.
[3] In September 1997, Presley was convicted of two counts of capital murder in connection with the robbery of a pawnshop in Birmingham during which Presley shot and killed two people. In October 1997, Presley was sentenced to death for those convictions. This court affirmed Presley's convictions and death sentence. See Pressley v. State, 770 So.2d 115
(Ala.Cr.App. 1999). We note that although the appellant's name is spelled differently, Marcus Presley and Marcus Pressley are the same individual.