SHAW, Judge.
The appellant, C.G., was convicted of sexual abuse in the first degree, a violation of § 13A-6-66, Ala.Code 1975, and was sentenced to seven years’ imprisonment. The victim was her five-year-old daughter, A.D.
The appellant contends that the evidence was insufficient to sustain her conviction. She preserved this issue for review by moving for a judgment of acquittal at the close of the State’s case.
“ ‘In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.’ ” Ballenger v. State, 720 So.2d 1033, 1034 (Ala.Crim.App.1998), quoting Faircloth v. State, 471 So.2d 485, 488 (Ala.Crim.App.1984), aff'd, 471 So.2d 493 (Ala.1985). “ ‘The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.’ ” Nunn v. State, 697 So.2d 497, 498 (Ala.Crim.App.1997), quoting O’Neal v. State, 602 So.2d 462, 464 (Ala.Crim.App.1992). “ When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and in such a case, this court will not disturb the trial court’s decision.’ ” Farrior v. State, 728 So.2d 691, 696 (Ala.Crim.App.1998), quoting Ward v. State, 557 So.2d 848, 850 (Ala.Crim.App.1990). “The role of appellate courts is not to say what the facts are. Our role ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury.” Ex parte Bankston, 358 So.2d 1040, 1042 (Ala.1978). (Emphasis in Bankston.)
The evidence adduced at trial indicated that in 1997, A.D. lived with her mother, the appellant, in a mobile home in Pratt-ville. A.D. testified that her father, M.D., “sometimes” stayed with them in the mobile home. (R. 24, 32.) According to A.D., on two or three occasions, when her father was visiting, he “hurt [her] on [her] private.” (R. 25.) A.D. specifically testified regarding an incident that occurred while she, the appellant, and her father were outside watching a comet. A.D. stated that while she was watching the comet with her parents, the appellant went inside to prepare dinner, leaving her alone outside with her father. After her mother went inside, A.D. said, her father placed her on the car and “rubbed on [her] private.” (R. 26.) A.D. testified that she could not remember the name for the part of her father’s body that he used to rub her, but stated that “it was his private.” (R. 28.) A.D. also testified about a second occasion of sexual abuse by her father, which, she said, occurred when the appellant again left her alone with her father. A.D. stated that she had told the appellant on two separate occasions that her father had hurt her, specifically that he had hurt her “privates.” A.D. also said that she no longer refers to the appellant as her “mama” because the appellant “didn’t protect [her]” from her father’s abuse and because the appellant “wasn’t the right mother that she was supposed to be.” (R. 29.)
Barbara J. Morris, a social worker with the Autauga County Department of Human Resources assigned to the Child Protective Services Unit, testified that she became involved in A.D.’s case in April 1997, when her office received a telephone *284 call reporting that A.D. had been sexually abused. Morris testified that she initially interviewed A.D. at her office to determine whether to involve law-enforcement officers. During that interview, Morris said, A.D. revealed that her father had sexually abused her. After contacting the proper authorities, Morris then telephoned the appellant and requested that A.D., who had been placed in the custody of the appellant’s sister when the allegations were initially reported, be allowed to remain with the appellant’s sister until the investigation was complete. Morris stated that she requested this arrangement because A.D. had indicated to her that the appellant and her father had frequent contact and because A.D. had told her that the appellant had known of the abuse and had failed to take any action to protect her or to prevent further instances of abuse.
Morris testified that she subsequently met with the appellant in person at the appellant’s place of employment. According to Morris, at that time, she gave the appellant the option of regaining custody of A.D. if she agreed to keep A.D. away from her father. However, because the appellant was unable to assure Morris that she would terminate all contact with A.D.’s father, A.D. remained in her aunt’s custody with the appellant’s approval. The record reflects that, at the appellant’s request, A.D. was later removed from her aunt’s home and sent to live with her uncle, the appellant’s brother, L.G., and his wife, J.G.[1] Morris testified that the appellant had told her that she would not discontinue contact with AD.’s father because she would not believe the allegations unless she heard them from A.D.
Morris also testified that, during her meeting with the appellant, she requested that the appellant not mention to A.D.’s father the allegations of sexual abuse until the investigation was complete. According to Morris, the appellant refused to cooperate, telling Morris that A.D.’s father “needed to know.” (R. 91.) In addition, during the interview, the appellant corroborated A.D.’s allegations that there were occasions when A.D. was alone with her father — once when the appellant went to feed a neighbor’s dog and once when the appellant left the house to pick up a pizza for dinner.
Morris further testified that she arranged a meeting between A.D., the appellant’s sister-in-law, and the appellant. Morris was also present at the meeting. During the meeting, Morris said, A.D. stated that she had told the appellant about her father’s abuse. According to Morris, the appellant did not appear shocked upon hearing A.D.’s statement, she merely asked when A.D. had told her about the abuse.
Morris also indicated that her office had supervised monthly visits between A.D. and the appellant. According to Morris, the visits were hostile. Morris said that A.D. had to be physically forced into the room with the appellant on more than one occasion; that A.D. had refused to enter the room with the appellant unless Morris was present; and that once in the room, A.D. had very little interaction with the appellant.
Morris stated that during her investigation of the abuse of A.D., she discovered that there had been a previous allegation of sexual abuse made against A.D.’s father by another victim in 1993. Although the prior report indicated a finding of sexual abuse, Morris said, the district attorney’s office had elected not to prosecute the case. However, according to Morris, when the present allegations arose, the district *285 attorney initiated prosecution on the 1993 charge, and AD.’s father pleaded guilty to that charge in exchange for charges pending against him in Autauga County alleging the sexual abuse of A.D. being dropped.[2] After concluding her investigation, Morris said, she was of the opinion that A.D. had been sexually abused.
Sharon Peggins, also a social worker with the Autauga County Department of Human Resources, testified that in October 1993 she investigated A.D.’s father in connection with the sexual abuse of a five-year-old girl who was the daughter of a family friend. Peggins stated that after conducting the investigation, she filed a disposition report in which she concluded that the victim had been sexually molested by A.D.’s father. Peggins testified that during an interview on October 4, 1993, with the appellant, who was living with A.D.’s father at the time, the appellant stated that after learning of the allegations, she had moved to Montgomery to live with her parents because she feared that her own children might be removed from her custody. Peggins stated that the appellant told her that A.D.’s father “normally tended to be attached to young girls between the ages of four and five,” and that A.D.’s father was uncomfortable bathing or performing other personal care tasks for A.D. (R. 69.)
Peggins testified that she spoke with the appellant again on October 7, 1993, when the appellant telephoned her. During this conversation, Peggins said, the appellant stated that after discussing the allegations with A.D.’s father, she and AD.’s father had decided that the victim needed to go to the doctor to be examined. Peggins stated that the appellant also said that she needed to have A.D. examined as well because A.D.’s father had “told her that he wasn’t sure.” (R. 71.) Peggins testified that she was concerned about A.D. at that time because of her father’s admission that he might have molested the first victim; however, because she felt the appellant was aware of the situation and would take any measures necessary to protect A.D., she did not start a file for A.D. at that time.
J.G., A.D.’s aunt and the appellant’s sister-in-law, also testified at the trial. According to J.G., at the time of the trial A.D. had lived in her home for approximately four years pursuant to a temporary custody order. J.G. said that when A.D. first came to live with her, she was generally afraid of men. J.G. also stated that on the first day A.D. was in her custody, A.D. made unsolicited disclosures regarding the sexual abuse by her father, and told her that she had repeatedly told the appellant about that abuse, but that the appellant had failed to help her. J.G. testified that A.D. told her that when she told the appellant what her father had done to her, the appellant had responded that “she [the appellant] liked it when Daddy did that to her.” (R. 60.) J.G. also testified that A.D. had said that on another occasion when she had told the appellant that her father had hurt her, the appellant said, “[W]ell, Daddy did a bad thing.” (R. 61.)
J.G. testified that when she and her husband accompany A.D. on court-ordered visitation with the appellant, A.D. attempts to avoid the appellant. According to J.G., A.D. now refers to her as “mama” and to her uncle as “daddy.” (R. 50.) J.G. also testified that when A.D. refers to her “privates,” she is talking about her vaginal area. (R. 62.)
*286 The appellant testified in her own defense at trial. She stated that she was not “100 percent” sure of A.D.’s father’s guilt either in the present case or in the 1998 case. (R. 138, 168.) The appellant denied that she had ever told A.D. that it feels good when A.D.’s father rubs her privates. According to the appellant, the only complaint A.D. made to her was in January 1997 when, she said, A.D. confronted both her and A.D.’s father and accused A.D.’s father of hurting her “coochie.” (R. 139.) However, according to the appellant, while relating the story, A.D. said that the injury was accidental. The appellant said that A.D. told her that the injury occurred while she was jumping on her father’s back to wake him and her father accidentally fell against her and she hit the wall.
The appellant admitted that she had left A.D. alone with her father on two occasions. On the first occasion, the appellant said, she left A.D. alone with her father for approximately 20 minutes while she went to a neighbor’s house to feed the neighbor’s dog. She stated that A.D.’s father was grading A.D.’s work in a preschool workbook when she left, and that when she returned, four pages of the workbook had been completed and A.D. was excited because she had received an “A” on a page where she had gotten all of the answers correct. (R. 147.) The appellant also said that she had left A.D. alone with her father on another occasion when she went to pick up a pizza. The appellant testified that when she left A.D. alone with her father on those two occasions, she had no idea that A.D. was going to be abused, and that because A.D. is a very verbal child, she believed that A.D. would have relayed any unusual occurrence upon her return. According to the appellant, she had never heard the content of AD.’s testimony at any time before the trial.
The appellant admitted, however, that when informed by Barbara Morris that it would be in her best interest not to tell AD.’s father about the allegations, she had stated that she had never lied to A.D.’s father and that she would not start by keeping the allegations from him. She also stated that at AD.’s father’s trial in Montgomery County, she had testified that she did not fully believe that he had ever molested A.D. According to the appellant, the allegations in Montgomery County arose out of the vindictiveness of the mother of A.D.’s father’s first victim, who, the appellant said, was the first person to speak to A.D. about the abuse, and who contacted A.D.’s aunt and the Department of Human Resources. The appellant said that she had watched AD.’s father’s behavior from 1993 to 1997 and that she had never seen any inappropriate actions. The appellant testified that she did not feel that she had done anything wrong by leaving A.D. alone with her father.
The appellant admitted, however, that at the time the allegations against A.D.’s father arose in 1993 regarding the first victim, AD.’s father had been drinking heavily and he had indicated to her that he “was afraid that if he could do something like that to [the victim] while he was in a drunken stupor, that there was a chance that he could have done something to his daughter.” (R. 145.) The appellant stated that she had had A.D. examined at that time, and that she had promised her family that she would not leave A.D. alone with her father.
The appellant contends that the evidence was insufficient to sustain her conviction for sexual abuse in the first degree under a theory of complicity because, she says, the State failed to prove that she intended “to promote or assist the commission of the offense” as required by the *287 complicity statute. § 13A-2-23, Ala.Code 1975.
Section 13A-2-23, Ala.Code 1975, provides:
“A person is legally accountable for the behavior of another constituting a criminal offense if, with the intent to promote or assist the commission of the offense:
“(1) He procures, induces or causes such other person to commit the offense; or
“(2) He aids or abets such other person in committing the offense; or
“(3) Having a legal duty to prevent the commission of the offense, he fails to make an effort he is legally required to make.”
In Porter v. State, 570 So.2d 823 (Ala.Crim.App.1990), this Court discussed the complicity statute, stating:
“The commentary to § 13A-2-23 states, in pertinent part, as follows:
“ ‘This section formalizes in simple terms the basic principles for determining criminal liability where based upon the behavior of another person or persons. It delineates both the type of action or omission required and the necessary mental state....
[[Image here]]
“ ‘... What this section does is define complicity in clear, direct and explicit terms, rather than attempt to accommodate the common-law concepts in defining accessorial liability. The test will be whether the accused with the intent to promote or assist the perpetration of an offense did any of certain enumerated acts in subdivisions (1) or (2) or failed to act (3).
[[Image here]]
“ ‘The three subparagraphs delineate various types of action or omission which might hold one to accountability. Subdivision (1) imposes liability in the situation where the defendant is the party who instigates or starts the eomplicitous conduct....
[[Image here]]
“ ‘Subdivision (2) imposes liability in the situation where one joins in the eomplicitous action. The classic words “aid and abet” are used. Aiding and abetting comprehends all assistance rendered by acts, or words of encouragement, or support or presence actual or constructive to render assistance should it become necessary, and no particular acts are necessary. ...
“ ‘Subdivision (3) places liability in the situation where the defendant who has a legal duty to prevent the crime fails to do so with the intent to further the crime. Although apparently there is no recent Alabama case law on this point, it has been established in other common law jurisdictions. See, e.g., People v. Chapman, 62 Mich. 280, 28 N.W. 896 (1886) (husband who had induced another to seduce his wife stood by and did not interfere with subsequent rape.) This would also comprehend the situation where a night watchman or policeman, if with an intent to aid the perpetrating party, stands by and neglects his duty to intervene. It should be noted that mere negligence in the night watchman situation would be insufficient for liability; one must also have the “intent to promote or assist the commission of the offense.” ’
“See also Powell v. United States, 2 F.2d 47 (4th Cir.1924); Rasberry v. State, 757 S.W.2d 885 (Tex.App.1988). For a discussion of criminal liability based on omission to act, see J. Hall, General Principles of Criminal Law 190-205, 208-11 (2d ed.1960); Frankel, Criminal *288 Omissions: A Legal Microcosm, 11 Wayne L.Rev. 367 (1965).
“Under subsections (1) and (2) of § 13A-2-23, an affirmative act on the part of the accused is required, while subsection (3) is concerned with the situations in which a person may be criminally responsible for the conduct of another by failing to act. Subsection (3) makes one a party who aids the commission of the offense by inaction. In other words, having a legal duty to prevent commission of the offense, and acting with intent to promote or assist its commission, he or she fails to make a reasonable effort to prevent commission of the offense.
“ ‘Most crimes are committed by affirmative action rather than by non-action. But there are a number of statutory crimes which are specifically defined in terms of failure to act; and other crimes which, though not specifically so defined, may be committed either by affirmative action or by failure to act under circumstances giving rise to a legal duty to act.
[[Image here]]
“ ‘(a) Duty to Act. For criminal liability to be based upon a failure to act it must first be found that there is a duty to act — a legal duty and not simply a moral duty. As we have seen, some criminal statutes themselves impose the legal duty to act, as with the tax statute and the hit-and-run statute. With other crimes the duty must be found outside the definition of the crime itself — perhaps in another statute, or in the common law, or in a contract.’
“W. LaFave and A. Scott, Substantive Criminal Law § 3.3 (1986) (footnotes omitted).”
570 So.2d 823 at 826-27.
In this case, the State proceeded under § 13A-2-23(3), Ala.Code 1975. The State argued at trial, and it argues on appeal, that the appellant had a legal duty to take appropriate steps to prevent A.D. from being abused; that the appellant failed to take those steps; and that, in failing to do so, the appellant intended to promote or assist A.D.’s father in sexually abusing A.D.
Although the appellant does not argue that she did not have a legal duty to care for and to protect her daughter (in effect, she concedes that she did have such a duty), we note that Alabama has recognized a duty on the part of a parent to care for and to protect his or her children. The Alabama Uniform Parentage Act defines the “parent-and-child relationship” as “the legal relationship existing between a child and his natural or adoptive parents incident to which the law confers or imposes rights, privileges, duties and obligations.” § 26-17-2, Ala.Code 1975. (Emphasis added.) In R.J.D. v. Vaughan Clinic, P.C., 572 So.2d 1225 (Ala.1990), the Alabama Supreme Court acknowledged that “[t]he parents’ common law duty to care for their children is widely recognized.” 572 So.2d at 1227. It said:
“ ‘It is ordinarily for the parent in the first instance to decide ... what is actually necessary for the protection and preservation of the life and health of his child, so long as he acts as a reasonable and ordinarily prudent parent would act in the like situation.’ ”
Id., quoting 59 Am.Jur.2d Parent and Child § 48, at 193-94 (1987). See also Silas v. Silas, 680 So.2d 368, 371 (Ala.Civ.App.1996).[3]
*289 Although we have found no eases in Alabama holding a nonperpetrating parent criminally liable for the sexual abuse of a child by another parent based on § 13A-2-23(3), Ala.Code 1975, other states have recognized a duty on the part of a parent to care for and protect his or her child and have upheld the conviction of a parent for the physical and sexual abuse of a child even though that parent was not the perpetrator of the abuse. See, e.g., Lundman v. McKown, 530 N.W.2d 807, 820 (Minn.Ct.App.), cert. denied, 516 U.S. 1092, 116 S.Ct. 814, 133 L.Ed.2d 759 (1996) (“A custodial parent has a special relationship to a dependent and vulnerable child that gives rise to duty to protect the child from harm.”); People v. Peters, 224 Ill.App.3d 180, 190, 586 N.E.2d 469, 476, 166 Ill.Dec. 511, 518 (1991), aff'd, 153 Ill.2d 218, 606 N.E.2d 1201, 180 Ill.Dec. 124 (1992) (holding that a mother may be found guilty of murder by reason of accountability in a case where her child was killed by her abusive boyfriend, because “[a] person who knows that his or her child is in a dangerous situation and fails to take action to protect the child, presumably intends the consequences of the inaction,” and “thereby, becomes legally accountable for the conduct of the abuser”); State v. Williquette, 125 Wis.2d 86, 370 N.W.2d 282 (Ct.App.1985), aff'd, 129 Wis.2d 239, 242, 385 N.W.2d 145, 147 (1986) (holding that “a parent who knowingly permits another person to abuse the parent’s own child subjects the child to abuse ...” and that the conduct of a mother who regularly left her two children in the exclusive care of their father despite allegedly knowing that he abused the children in her absence was overt conduct rather than a mere omission to act); State v. Walden, 306 N.C. 466, 293 S.E.2d 780 (1982) (holding that a mother may be found guilty of assault on a theory of aiding and abetting on the sole basis that she was present when the child was assaulted and failed to take reasonable steps to prevent that assault).
We cite with approval the language of the North Carolina Supreme Court, as quoted by the North Carolina Court of Appeals in State v. Ainsworth, 109 N.C.App. 136, 426 S.E.2d 410 (1993), regarding a parent’s duty to his or her children:
“ ‘[W]e believe that to require a parent as a matter of law to take affirmative action to prevent harm to his or her child or be held criminally hable imposes a reasonable duty upon the parent. Further we believe this duty is and has always been inherent in the duty of parents to provide for the safety and welfare of their children, which duty has long been recognized by the common law and by statute. This is not to say that parents have the legal duty to place themselves in danger of death or great bodily harm in coming to the aid of their children. To require such, would require every parent to exhibit courage and heroism which, although commendable in the extreme, cannot realistically be expected or required of all people. But parents do have the duty to take every step reasonably possible under the circumstances of a given situation to prevent harm to their children.
“ ‘In some cases, depending upon the size and vitality of the parties involved, it might be reasonable to expect a parent to physically intervene and restrain the person attempting to injure the *290 child. In other circumstances, it will be reasonable for a parent to go for help or to merely verbally protest an attack upon the child. What is reasonable in any given case will be a question for the jury after proper instructions from the trial court.’ ”
109 N.C.App. at 143-44, 426 S.E.2d 410, quoting State v. Walden, 306 N.C. at 475-76, 293 S.E.2d at 786-87. (Emphasis added.)
The appellant argues that although she had a duty as a parent to protect A.D. from harm, the State failed to prove that when she left A.D. alone with her father, she intended to promote or assist A.D.’s father in sexually abusing A.D., as required for a violation of § 13A-2-23, Ala. Code 1975. Specifically, she maintains that because she was not present when the abuse occurred and because she testified that she did not know when she left A.D. alone with her father that A.D. was going to be abused, the evidence was insufficient to establish that she was an accomplice. We disagree.
Accomplice liability requires that the accomplice intend to promote or to assist the principal in the commission of the offense. See, e.g., Prantl v. State, 462 So.2d 781, 783 (Ala.Crim.App.1984) (“The thrust [of accomplice liability] is to place liability on one who has the more positive mental state of promoting or actively assisting in the perpetration of an offense.”). To have such an intent, the accomplice must have “knowledge that the principal is engaging in, or is about to engage in, criminal conduct.” Simmons v. State, 649 So.2d 1282, 1284 (Ala.1994), citing Committee Comments to § 13A-2-23, Ala.Code 1975.
Here, there was sufficient evidence from which a jury could have reasonably concluded that the appellant knew, when she left A.D. alone with her father, that her father was going to abuse her. A.D. testified that she had told the appellant on more than one occasion that she had been sexually abused by her father, but that the appellant failed to take any measures to prevent future abuse. Barbara Morris stated that when directly confronted with A.D.’s allegation that she had been abused and that she had told her mother about the abuse, but that her mother had done nothing to prevent it, the appellant did not seem surprised and did not deny that she had known about the abuse. Perhaps even more damaging, when A.D. informed the appellant about the abuse, she said, the appellant responded that “she [the appellant] liked it when Daddy did that to her” on one occasion, and commented later that “Daddy did a bad thing.” Furthermore, the appellant failed to cooperate during the investigation and also refused to take steps to protect A.D. after the allegations came to light. The State presented evidence that allegations of sexual abuse had been lodged against AD.’s father in 1993; that the appellant knew of those allegations; and that the appellant had moved to another county to get away from AD.’s father because of those allegations. The appellant herself testified that she had had A.D. examined by a doctor at that time because A.D.’s father had indicated to her that he was afraid that “there was a chance that he could have done something to his daughter.” (R. 145.) When interviewed by Sharon Peggins regarding the allegations in 1993, the appellant told Peg-gins that A.D.’s father “tended to be attached to young girls between the ages of four and five” and that A.D.’s father had told her that he was not sure if he had sexually abused the first victim. (R. 69.) In addition, the appellant stated that, when the 1993 allegations initially arose, she had promised her family that she would never leave A.D. alone with her *291 father. Yet the appellant admitted leaving A.D. alone in the company of her father on at least two occasions. This evidence was more than sufficient to establish that the appellant either knew or should have known that leaving A.D. alone with her father created the danger that A.D. would be sexually abused.
Despite the fact that the appellant was not present at the time of the abuse, because there was sufficient evidence that the appellant knew, or should have known, that there was a probability that A.D.’s father would sexually abuse her in the appellant’s absence, the jury could have reasonably concluded, based on all the evidence, that the appellant, by leaving A.D. alone with her father knowing that there was a substantial likelihood that A.D. would be abused, intended to promote or to assist the sexual abuse of A.D. “ ‘ “Intent, ... being a state or condition of the mind, is rarely, if ever, susceptible of direct or positive proof, and must usually be inferred from the facts testified to by witnesses and the circumstances as developed by the evidence.” ’ ” Wilson v. State, 777 So.2d 856, 932-33 (Ala.Crim.App.1999), aff'd, 777 So.2d 935 (Ala.2000), cert. denied, 531 U.S. 1097, 121 S.Ct. 826, 148 L.Ed.2d 709 (2001), quoting French v. State, 687 So.2d 202, 204 (Ala.Crim.App.1995), rev’d on other grounds, 687 So.2d 205 (Ala.1996), quoting in turn McCord v. State, 501 So.2d 520, 528-29 (Ala.Crim.App.1986). “The intent of a defendant at the time of the offense is a jury question.” Downing v. State, 620 So.2d 983, 985 (Ala.Crim.App.1993).
Moreover, the appellant’s testimony that she did not know A.D.’s father was going to abuse A.D. and that she did not intend to promote or to assist the abuse only created a conflict in the evidence; that conflict was for the jury to resolve. “Conflicting evidence presents a jury question not subject to review on appeal, provided that the [S]tate’s evidence established a prima facie case.” Presley v. State, 770 So.2d 104, 111 (Ala.Crim.App.1999), aff'd, 770 So.2d 114 (Ala.2000), cert. denied, 531 U.S. 881, 121 S.Ct. 194, 148 L.Ed.2d 135 (2000). “ ‘This court will not interfere when the evidence is conflicting if there was material evidence tending to support the jury’s verdict.’ ” Marks v. State, 581 So.2d 1182, 1185 (Ala.Crim.App.1991), quoting Washington v. State, 539 So.2d 1089, 1100 (Ala.Crim.App.1988). “ ‘Where there is evidence from which the jury may by fair inference find the defendant guilty, the trial court should submit the case to the jury to determine the weight it will give the evidence, and this Court should not disturb the verdict.’ ” Miller v. State, 645 So.2d 363, 368 (Ala.Crim.App.1994), quoting Giles v. State, 440 So.2d 1237, 1239 (Ala.Crim.App.1983), rev’d on other grounds, 497 So.2d 201 (Ala.1986). Because the State presented sufficient evidence of the appellant’s intent to warrant sending the case to the jury, the trial court did not err in denying the appellant’s motion for a judgment of acquittal.
The judgment of the trial court is affirmed.
AFFIRMED.
McMILLAN, P.J., and COBB, J., concur.
BASCHAB, J., concurs specially, with opinion.
WISE, J., recuses herself.

. L.G. and J.G. had custody of A.D. at the lime of the trial.

. Although the charges against A.D.'s father in Autauga County were dropped, the record reflects that he was indicted and convicted on a charge of sexual abuse of A.D. that occurred while they were visiting his mother at her residence in Montgomery County.

. The Alabama Supreme Court has also created an exception to the doctrine of parental immunity; under that exception a child may seek civil redress for personal injuries arising *289 out of sexual abuse not only against the actual perpetrator of the abuse, but also against an allegedly negligent, nonperpetrating parent who "allowed the abuse to occur.” Hurst v. Capitell, 539 So.2d 264, 265 (Ala.1989). See also Henderson v. Woolley, 230 Conn. 472, 644 A.2d 1303 (1994).